*E-FILED 3/16/07*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JOEL BEININ, | NO. C 06-2298 JW (RS) |
| Plaintiff, | **ORDER DENYING MOTIONS TO COMPEL** |
| v. | |
| THE CENTER FOR THE STUDY OF POPULAR CULTURE, | |
| Defendant. | |

## I. INTRODUCTION

Defendant The Center for the Study of Popular Culture ("the Center") moves (1) to compel third party witness Theodore Mock to comply with a subpoena for the production of documents and, (2) to compel plaintiff Joel Beinen to disclose certain information and documents he has withheld under claims of associational privacy or work product protection. Beinin, in turn, moves to compel the Center to supplement certain interrogatories and its privilege log. Based on the parties' briefing, the arguments of counsel, and the record herein, the motions will be denied, as explained below.

## II.  BACKGROUND

The general background of this action was described in the Court's prior order filed on October 31, 2006 and will not be repeated here.  The motion involving Theodore Mock, however, requires additional background.  Mock is the sole proprietor of Mock Photography.  Since 1969, Mock Photography has been in the business of providing photographic services in and around Palo Alto, California. These services include portraiture, wedding and event photography, and photograph restoration.

Sometime in early 1997, Professor Beinin made an appointment with Mock to have his portrait taken for his upcoming book, *The Dispersion of Egyptian Jewry: Culture, Politics and the Formation of a Modern Diaspora.* On March 4, 1997, Beinin sat for his portrait. During the session, Mock took photographs of Beinin in various poses. Beinin then chose the photograph at issue in this litigation and paid for the sitting fee and two copies of the photograph. Mock did not hear from Beinin again until August or September 2005.

At that time, Beinin contacted Mock about the use of the photograph on the cover of the Center's pamphlet.  Mock informed Beinin that he had never seen the pamphlet nor had he granted permission to the Center to use the photograph. Mock then agreed to assign his copyright in the photograph to Beinin.

According to Mock, he is a sole proprietor and he occasionally hires two part-time employees to assist him on an as needed basis. For each customer's photography order, Mock prepares a file including the name of the customer, contact information, and date on which the photograph was taken. The file also includes negatives, invoices, sales receipts, and occasionally notes on the customer. Were a customer to request a copyright assignment, any documents related to that assignment would be placed in that customer's file. Mock admits that some of this documentation may have been lost. Each customer file has a number assigned to it that corresponds with the customer's name in Mock's Rolodex. That way, if a customer comes in to purchase an additional copy of a photograph, Mock can look up the customer's name on his Rolodex and find the file according to the assigned number. Mock estimates that he has created 2,500 or more unique customer  files over the last ten years. The files from 1989 to 2003 are kept offsite in a storage

2

1  facility. The more recent files are kept onsite at Mock's Palo Alto studio.

2  In November of 2006, the Center served a subpoena for the production of documents that
3  requested, *inter alia*, all documents "concerning [Mock's] granting of any rights, including but not
4  limited to the granting of an assignment of a license, to any PERSON for the USE of any photograph
5  other than the PHOTOGRAPH" at issue. (Request No. 7). The subpoena also requested all
6  documents concerning "any revenues, money, or other compensation received by [Mock] in return
7  for any use of a photograph" other than the one at issue in this case. (Request No. 8). The requests
8  covered the time period between the date Mock took the photograph at issue (March 4, 1997)
9  through to the present. Mock objects to these two requests on the grounds that compliance will
10 subject him to an undue burden.

## III  LEGAL STANDARDS

12 "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the
13 claim or defense of any party." Fed R. Civ. P. 26 (b)(1).  The matter is relevant when it seeks
14 admissible evidence or when the evidence is "reasonably calculated to lead to the discovery of
15 admissible evidence." Fed.R.Civ. P. 26(b)(1). This same relevancy standard applies to third-party
16 subpoenas. See *Truswal Sys Corp. v. Hydro Air Eng'g Inc.*, 813 F.2d 1207, 1209-12 (Fed. Cir.
17 1987).

18 The Federal Rules of Civil Procedure also, however, "afford nonparties special protection
19 against the time and expense of complying with subpoenas." *Exxon Shipping Co. v. United States*
20 *Department of Interior*, 34 F.3d 774, 779 (9th Cir. 1994). Rule 26(b)(2) instructs courts that
21 discovery may be limited if a court determines that *"the burden or expense of the proposed*
22 *discovery outweighs its likely benefit*, taking into account the needs of the case, the amount in
23 controversy, the parties' resources, the importance of the issues at stake in the litigation, and the
24 importance of the proposed discovery involving the issues." Fed R.Civ.P. 26(b)(2)(C)(iii) (emphasis
25 added). In addition to the discovery standards of Rule 26, Rule 45 provides that upon "timely
26 motion, the court by which a subpoena was issued shall quash or modify the subpoena if it . . .
27 subjects a person to undue burden." Rule 45 (c)(3)(A)(iv). When applied to third parties, discovery
28 can be limited to protect them from harassment, inconvenience, or disclosure of confidential

documents. *Dart Indus. Co. v. Westwood Chem. Co.*, 649 F.2d 646, 649 (9th Cir. 1980)(citations omitted). Underlying this protection is the understanding that, "the word 'non party' serves as a constant reminder of the reasons for the limitations that characterize 'third party' discovery." *Id.* A court keeps this distinction between a party and nonparty in mind when it determines the propriety of a nonparty's refusal to comply with a subpoena by balancing "the relevance of the discovery sought, the requesting party's need, and the potential hardship to the party subject to the subpoena." *Gonzales v. Google*, 234 F.R.D. 674, 680 (N.D.Cal 2006); *see also* Fed. R. Civ. Pro. 45 (c)(3)(B)(iii).

## IV. DISCUSSION

### A. The Center's Motion Against Beinen

The Center's document Request No. 15 seeks any documents, including emails that refer or relate to the Center, or its principal, David Horowitz, or other representatives. Request No. 17 seeks any statements of fact or opinion concerning any of the issues in this action. In response to No. 15, Beinin has produced copies of numerous emails he has received or sent regarding this action, including emails from persons expressing support for Beinin with respect to the disputes between him and the Center, including his prosecution of this action. Beinin's formal document response to Request No. 17 denies that any non-privileged responsive documents exist. Given that the emails produced in response to No. 15 would appear also to be responsive to this request, Beinin seems to have meant that no *additional* non-privileged documents responsive to Request No. 17 exist beyond those responsive to other requests.

The present dispute is two-fold. First, Beinin has redacted the names and email addresses of many of the other parties with whom he had email correspondence, and second, he has withheld some emails entirely, asserting attorney-client privilege and work-product protection. The Center contends that neither the redactions nor the withholding of entire emails is appropriate. The two issues will be addressed in turn.

     1. Identities of Beinin's Correspondents

4

The Center contends that Beinin's "true purposes" in bringing this suit are relevant to its affirmative defenses of copyright misuse and unclean hands. In response, Beinin quarrels with the Center's legal conclusions that his conduct would amount to copyright misuse or unclean hands even if its characterizations of the facts and his motives is accurate.[1] There is no real dispute, however, that the *content* of the emails in dispute was sufficiently relevant, at least for purposes of discovery, to make their production appropriate. Ordinarily it would follow that if the content of the emails is relevant and discoverable then the identities of the senders and recipients would also be relevant and discoverable, absent some other consideration. Here, Beinin contends that the qualified privilege of associational privacy serves to protect the identities of his supporters. The applicable law was summarized in *International Society for Krishna Consciousness, Inc. v. Lee*, 1985 WL 315 (S.D.N.Y. 1985):

> The starting point of the analysis is the Supreme Court's decision in *NAACP v. Alabama*, 357 U.S. 449 (1958). The Court there stated:
>
> It is beyond dispute that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech . . . . It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute [an] effective . . . restraint on freedom of association.

1985 WL at *7.

The *Krishna* court further explained that from this right of associational privacy, there "has been derived a qualified privilege, which applies to compelled disclosure of the identity of an association's members or sympathizers." *Id.* at *8. The court noted that "[t]he privilege is designed to protect members of groups from harassment and intimidation, [citations], and to prevent the 'chilling effect' that disclosure may have on the willingness of individuals to associate with the group. [Citation.]" *Id.*

Although the privilege is a qualified one that may be overcome in appropriate circumstances, "it is clear that First Amendment privacy interests will be overridden only when the party seeking

---

[1] Specifically, Beinin contends that absent behavior in the nature of an anti-trust violation or some form of activity that suppresses creative expression, there can be no copyright misuse. Beinin argues that the unclean hands doctrine is inapplicable because he is only seeking to enforce copyright and has in no way attempted to suppress the Center's rights under the First Amendment. In the Center's view, Beinin *has* used this litigation in an attempt to chill the Center's expression.

5

the information asserts a compelling interest." *Id.* To establish a compelling interest, the party "must show that the information sought 'is crucial to the party's case,' [citation], or that it goes to the 'heart of the claims,' [citation], or that it is 'directly relevant to the [party's] claim.' [Citations.] *Id*.

Here, the Center suggests that the associational privilege is unavailable to Beinin because he is an individual, not an organization. The Center argues that the privilege cannot be extended to shield the identities of individuals who communicate with an individual about a dispute with a third party without creating a presumptive barrier to the discovery of relevant witnesses in many civil cases. This argument fails to afford adequate recognition to the nature of the communications in dispute and the circumstances of this suit. While it is true that Beinin is not an organization and does not appear to have formed any formal organization adverse to the Center, the communications in dispute are between and among people who share political views and goals, including specifically a desire to support Beinin in his disputes with the Center (including, but not limited to this action). Indeed, some of the emails suggest making efforts to create a "defense fund" or otherwise organize in support of Beinin's efforts. As such, the interests that underlie the associational privilege are fully implicated notwithstanding the fact that there is no formal organization *per se*.

Furthermore, the Center has not shown a compelling need for the identities of Beinin's supporters. Even assuming Benin's "motivations" in bringing this suit are relevant to the Center's affirmative defenses, any further information on that subject that conceivably could be gathered through disclosure of the supporters' identities would be cumulative, at best.[2] Beinin has made no secret of his feelings and views. Whether or not Beinin's conduct constitutes copyright misuse or unclean hands remains to be decided but additional evidence on the point would be superfluous.

---

[2] The Center complains that it was previously required by this Court's order to produce materials "wholly unrelated" to Beinin's copyright claim and that the Court therefore should not entertain arguments from Beinin that the Center's discovery requests are too attenuated. The financial materials the Center was required to produce were directly relevant to Beinin's claim for damages based on his contention that the Center derived substantial revenues from prominently displaying the cover of the pamphlet (including his picture) on its website. The Center's contention that such revenues are too "indirect" to be recoverable presents what appears to be a mixed question of fact and law to be decided in proceedings on the merits. In any event, a party's disagreement with a court's conclusion that certain materials are subject to production does not translate into a cognizable argument that the other side is precluded from objecting to the production of "irrelevant" materials.

6

#### 2. Withheld emails

Beinin has withheld in their entirety a handful of emails consisting of communications he had with third parties shortly before this suit was filed. Beinin has made a sufficient showing that these emails were part of a fact-gathering process undertaken at the direction of counsel in preparation for litigation. As such, the emails were properly withheld under the work product doctrine. The only relevance the Center can show is again that the documents might shed further light on Beinin's motives and goals in bringing this suit. For the reasons discussed above, that is not a compelling need that would justify breaching the protection given to work product.

### B. The Center's Motion Against Mock

Mock argues that the documents sought by Request Nos. 7 and 8 of the subpoena are not relevant and that the production of those documents would be unduly burdensome. As explained below, both of Mock's bases for objection have merit.

#### 1. Relevance

Any information sought by means of a subpoena must be relevant to the claims and defenses in the underlying action. This requirement receives a liberal construction such that it often permits the discovery of evidence that may not ultimately be admissible at trial. Here, the Center is requesting documents pertaining to licenses, assignments, and other similar grants of rights for the use of photographs. Additionally, the Center is also requesting any documents reflecting any money received by Mock in return for such grants of rights. In theory, there could be some arguable relevance to these documents, if they exist, because evidence of past licensing of photographs taken by Mock could be some indicator of the market value of the disputed photograph at the time of the alleged infringement.[3] That value could bear both on the question of reasonable royalty and the Center's affirmative defense of fair use – specifically, the fourth fair use factor, which addresses whether the Center's use of the photograph affected the potential market and value of the disputed photograph.

---

[3] The fact that an earlier licensing may have occurred some years prior in time to the alleged infringement would not necessarily make it wholly irrelevant as an indicator of market value at the time of the infringement, but it does further undermine any probative value.

7

The probative value of the requested documents in this case, however, is minimal at best. Mock recalls only one other photograph that he has ever assigned or licensed. While he believes that there may have been other assignments over the years, he has no recollection of such assignments other than the two instances he mentions in his declaration (which includes the assignment of the Beinin photograph). But even if additional assignments or licenses exist, the Center has made no showing that such disconnected photographs would have other than the most tenuous relationship to the issues presented in this action.

### 2. Undue Burden

Whether a subpoena imposes an undue burden upon a witness is a specific inquiry that turns on the facts of each case. Here, Mock presents evidence pertaining to the time, cost, and inconvenience entailed in responding to the third-party subpoena. Specifically, Mock details the cumbersome manual process of reviewing 2,500 unique customer files to ensure compliance with the subpoena. Mock estimates that locating and organizing the last decade of his files will take at least three days. This is in addition to the effort of moving the records stored offsite to his Palo Alto office. Mock is a sole proprietor, who could experience a loss of revenue if forced to incur time in the search efforts. Mock estimates that the time required for the review of the files would be at least 40 hours at a cost of $11,400.

Courts balance the need for discovery against the burden imposed on the person from whom documents are sought, and the status of the person as a nonparty is a factor that weighs against disclosure. Compelling Mock, a nonparty witness,[4] to comply with the Center's request for the requested documents would inflict costs and burdens disproportionate to whatever minimal evidentiary value the documents might have.

---

[4] The Center's argument that Mock is not entitled to the protections ordinarily given third parties because he is aligned with Beinin and represented by the same counsel is not persuasive. There is no evidence that Mock has any significant connection to Beinin or any interest in this litigation. He appears to have been drawn into this dispute by the happenstance of Beinin's choice to use him as a photographer a decade ago.

8

### C. Beinin's Motion Against the Center

Beinin challenges the adequacy of certain of the Center's interrogatory responses and its privilege log.

#### 1. Interrogatory Responses

Beinin complains that The Center's responses to Interrogatory Nos. 16, 17, and 20 are factually deficient and improperly incorporate other responses. Although incorporation by reference can make responses difficult to follow or understand, here the references to other responses in the same set of interrogatories do not present such problems. Even if the practice is not ideal, the Court will not compel the Center to perform the idle act of what would be a simple matter of "cut and paste" to format the responses such that the incorporated material is included in each response.

As to Beinin's contention that the responses do not state sufficient facts, Beinin's argument is more appropriately made in summary judgment proceedings or at trial. The interrogatories require The Center to state the factual basis for its defenses, and the Center has done so. If Beinin is correct that the facts stated are legally insufficient to support those defenses, he can advance that argument on the merits as to those defenses.

#### 2. Privilege Log

Beinin complains that The Center has omitted date information from some entries on its privilege log. The Center explains that it has only redacted the date information where it reflected when the document was *transmitted to counsel* as part of the document collection efforts undertaken in response to Beinin's discovery requests. As such, the information is akin to a cover letter that might have accompanied a document collection in the pre-email era, and it is therefore part of the work product to which Beinin is not entitled.

9

## V. CONCLUSION

The motions to compel are DENIED.

IT IS SO ORDERED.

Dated: March 16, 2007

_____
RICHARD SEEBORG
United States Magistrate Judge

**United States District Court**
For the Northern District of California

C 06-2298 JW (RS)